NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil No. 16-2133 (RBK/AMD) |
| v. | **OPINION** |
| John Alfay Salama MARKUS, | |
| Defendant. | |

**KUGLER**, United States District Judge:

John Alfay Salama Markus sold confidential bidding information concerning U.S. government contracts in Iraq in exchange for kickbacks and bribes and did not report this income for the purposes of his taxes. Now the Government seeks to impose penalties for this failure to report and has moved for summary judgment. (ECF No. 31.) Markus, apparently impatient for a disposition, has since filed a "Motion for Final Decision" (ECF No. 58) and a "Motion to Return to FCI Fort Dix." (ECF No. 59.) As Markus has not refuted the facts presented, nor does it appear he would be able to after pleading guilty to several crimes relating to this conspiracy, the Government's Motion for Summary Judgment is **GRANTED**. As for Markus's other motions, neither are cognizable in this proceeding and they are, accordingly, **DENIED**.

I.   BACKGROUND

John Alfay Salama Markus, a U.S. citizen born in Egypt, was a combat engineer for the U.S. Army from around 2002 to 2005, during which time he was deployed to Iraq. (Pl. SUMF ¶¶ 1–3.) After leaving active duty, Markus worked for the Army Corps of Engineers as a project engineer, where he continued to be deployed to Iraq to aid in reconstruction efforts. (*Id.* ¶ 4.)

1

Markus is embroiled in this civil litigation today because he accepted bribes and kickbacks in exchange for confidential bid information for an oil pipeline project. (*Id.* ¶ 5.) These bribes were offered by Ammar Al-Jobory and Ahmed Nouri, two Iraqi citizens. (*Id.* ¶ 12.) Markus deposited bribes in bank accounts in Egypt and Jordan, whose funds were subsequently transferred to his personal accounts in the United States. (*Id.* ¶¶ 6–7.) Some of these funds were spent on a house.

A. **The Accounts**

1. *Banque Misr*

One account was with Banque Misr in Cairo, whose owner of record was Markus's father, Alfy Salama Marcos Basily. (*Id.* at ¶ 8–9.) The account number ended with -2393. (*Id.* ¶ 9.) Markus's brother held power of attorney over this account. (*Id.* ¶ 10.) Bribes were deposited into this account and were then forwarded on to Markus's accounts in the United States. (*Id.* ¶ 11.)

The Government has presented irrefutable evidence of Markus's activities. On October 15, 2006, Markus emailed Al-Jobory for payment:

> I did not receive the money till now can you check what is happen and let me know, I need to pay the money for the house. It is important to answer me I need the money ASAP.

(*Id.* ¶ 12; Ex. 151-SW.) Al-Jobory responded three days later that "[h]ere is the proof that the it [sic] has been there since the 10th of Oct." (*Id.*; Ex. 152-SW.) A deposit slip dated October 10, 2006 showed a deposit of $25,000 into the account ending with -2393 and in the name of Marcos Basily, Markus's father. (*Id.*) Markus admits this deposit was made to him, even though his father's name is listed on the deposit slip as the account owner. (*Id.*; Markus Dep. 83:13–84:11.)

On April 20, 2007, Markus emailed Nouri, directing him to deposit money paid for HVAC units into his father's Banque Misr account ending with -2393. (*Id.*) Markus has confessed that he accepted payment from Nouri and Al-Jobory. (*Id.* ¶ 13; Markus Dep. 85:4–11.) The Banque Misr

2

account had sums far exceeding $10,000 during 2007, 2009, and 2009, with deposits of $299,000, $160,000, and $100,000 made in each of those years. (*Id.* ¶ 14.)

Markus controlled this account and directed his brother to distribute funds from the account on his behalf, ostensibly, it seems, as payment to employees whose families lived outside war-torn Iraq. (*Id.*; Markus Dep. 169:4–170:21.)

  2. *Housing Bank Accounts*

Markus also had at least three accounts with the Housing Bank for Trade and Finance (the "Housing Bank") in Jordan. As relevant, two accounts had funds in them for 2007 and one for 2009. (*Id.* ¶ 16.) These accounts ended, respectively, with -70220 ("Housing Bank I account"), -0201 ("Housing Bank II account"), and -80220 (Housing Bank III account"). (*Id.*) Markus deposited $200,000 into his Housing Bank I account and $90,000 into the Housing Bank II account in August 2007. (*Id.* ¶ 18.) In June 2009, Markus transferred $580,000 from the Housing Bank III account to a Bank of America account. (*Id.*)

**B. Willful Failure to Report Foreign Bank Accounts**

Markus had a foreign bank account from 2002 to 2009. (*Id.* ¶ 19.) During such time he had someone else complete his tax returns, but Markus signed the forms and filed them with the IRS. (*Id.*) Markus never investigated whether he was obliged to report his foreign accounts to the U.S. government. (*Id.* ¶ 20; Markus Dep. 138:2–7.)

In 2007, Markus failed to file a Report of Foreign Bank and Financial Accounts ("FBAR") regarding the Banque Misr, Housing Bank I, and Housing Bank II accounts. (*Id.*) In a plea allocution in September 2012, Markus admitted he had engaged in a criminal kickback scheme from July 2006 to July 2009; and the Government maintains that Markus's failure to report his foreign bank accounts in 2007 was purposefully done to avoid exposing this scheme. (*Id.* ¶ 22.)

In 2008, Markus filed an FBAR. But although he knew he was obliged to do so, he reported only one Jordanian account. (*Id.* ¶ 25.) Markus indicated on a form Schedule B, which is used to disclose foreign interests, that he had interests in foreign bank accounts and was obliged to report all those accounts. (*Id.* ¶ 26.) Dennis Tomsky, an enrolled agent with the privilege of representing taxpayers before the IRS, prepared Markus's income tax return for 2008. (*Id.* ¶ 28.) Markus admitted that he told Tomsky about accounts in Jordan as well as in Kuwait and possibly Saudi Arabia, but that he never mentioned the Egyptian account. (*Id.* ¶ 29; Tomsky Dep. 18:4–19:4.) Of these accounts, only the Jordanian account was reported. (*Id.*) The Banque Misr account was not reported. (*Id.*) Tomsky maintains that if Markus had told him about another foreign account, it would have been included on the Schedule B. (*Id.* ¶ 31.) All of this is unrefuted.

Finally, in 2009, Markus did not file an FBAR at all. At his plea allocution, Markus confessed that he intentionally and willfully failed to file a FBAR. (*Id.* ¶ 32; Markus Plea Allocution, Ex. D, 28:15–29:11.) Markus also failed to file a Schedule B for that year. (*Id.* ¶ 33.)

### C. The Criminal Investigation and Assessment of Civil Penalties

In July 2010, Markus's home was searched pursuant to a warrant, at which time investigators located and seized bank records, notes, statements, emails, and other documents. (*Id.* ¶ 36.) The Government brought a 54-count indictment against Markus in June 2011, and on September 7, 2012, Markus pleaded guilty to one count each of honest services wire fraud, money laundering, and willfully failing to file an FBAR for 2009. (*Id.* ¶ 38.) He admitted at his plea allocution to opening, establishing control over, and using foreign bank accounts in both Jordan and Egypt to receive illegal bribe and kickback payments from July 2006 to July 2009. (*Id.* ¶ 39.) Markus specifically allocuted that the balance of his foreign bank accounts in 2009 exceeded $10,000. (*Id.* ¶ 40.) The remainder of the charges were dismissed.

4

Markus has testified that he provided confidential bid information in exchange for a kickback of 5% of the value of each federal contract awarded to his co-conspirators. (*Id.* ¶ 41; Markus Dep. 107:16–114:20.) He also confessed that the funds in the accounts that he failed to report were proceeds of bribes and kickbacks paid in 2007. (*Id.* ¶ 42.)

As a consequence of Markus's willful failure to report his interest in the Banque Misr and three Housing Bank accounts, the IRS assessed civil penalties against him on April 22, 2014.

| Year | Bank Account | Account Number | Account Balance | Penalty Assessed |
|------|--------------|----------------|-----------------|------------------|
| 2007 | Banque Misr | -2393 | $299,250 | $100,000 |
| 2007 | Housing Bank I | -70220 | $744,854 | $372,427 |
| 2007 | Housing Bank II | -0201 | $90,000 | $45,000 |
| 2008 | Banque Misr | -2393 | $364,950 | $100,000 |
| 2009 | Banque Misr | -2393 | $400,000 | $218,225 |
| 2009 | Housing Bank III | -80220 | $680,000 | $6,362 |

(*Id.* ¶ 43; IRS Forms 13448 Penalty Assessment Certification (Title 31 "FBAR"), Ex. G; Remington Decl. ¶¶ 3–5.) Inclusive of unpaid penalties and interest, the balance assessed to Markus as of November 13, 2017 is $1,052,101.29. (*Id.*, Ex. H.)

The Government filed this action on April 18, 2016, seeking to impose civil penalties on Markus pursuant to 31 U.S.C. § 5321 for a willful failure to file complete FBARs for 2007, 2008, and 2009, as required under 31 U.S.C. § 5314 and its regulations. (Compl. at 4.) The complaint seeks $948,752.83 for the penalties assessed against him under 31 U.S.C. § 5321, with interest, costs, and statutory additions as applicable. (*Id.*)

Markus has not refuted any of the foregoing facts, with the lone exception that he contends he was acquitted of 54 counts brought against him, a contention grounded in a mistaken conflation of dismissals with acquittals. He has also not presented a responsive statement of material facts. By doing so, he has thereby declined to dispute the Government's well-supported factual record,

5

with the attendant consequence that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1.

## II. THE RULE 56 STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F.

App'x 353, 354 (3d Cir. Sept. 17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

Although the Third Circuit has not yet ruled on what standard of review applies to a determination of the validity of an IRS penalty under 31 U.S.C. § 5321, those courts that have considered the question have found the correct standard to be de novo. *See Bedrosian v. United States Dep't of Treasury, Internal Revenue Serv.*, No. CV 15-5853, 2017 WL 4946433, at *2 (E.D. Pa. Sept. 20, 2017); *United States v. Williams*, No. 09-437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010), rev'd on other grounds, *United States v. Williams*, 489 Fed. App'x 655 (4th Cir. 2012) (looking to enforcement actions brought by the government in other contexts which require a de novo review, as well as the fact that Section 5321 provides for no adjudicatory hearing before an FBAR penalty is assessed, to conclude that de novo review is appropriate); *United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012) (applying *de novo* standard to whether underlying penalty was valid).

### III. DISCUSSION

#### A. Statute of Limitations

Markus argues the statute of limitations bars this action insofar as it concerns FBARs for 2007 and 2008. This is without merit. The Secretary of the Treasury "may assess a civil penalty" for not filing a FBAR "at any time before the end of the 6-year period beginning on the date of the transaction with respect to which the penalty is assessed." 31 U.S.C. § 5321(b)(1). Under 31 C.F.R.

§ 1010.306(c), reports, including FBARs, "shall be filed . . . on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." Markus was required to file FBARs for 2007 and 2008 by June 30, 2008 and June 30, 2009, respectively. Penalties for both 2007 and 2008 were timely assessed on April 22, 2014, within the six-year period.

As for the commencement of a civil action, the Secretary of the Treasury "may commence a civil action to recover a civil penalty assessed . . . at any time before the end of the 2-year period" including from "the date the penalty was assessed." 31 U.S.C. § 5321(b)(2). As the Government assessed a penalty on April 22, 2014, it had until April 22, 2016 to commence a civil action. The Government filed suit on April 18, 2016. The applicable statute of limitations therefore does not bar this action.

### B. Collateral Estoppel

Markus also argues that because he did not plead guilty to FBAR violations in 2007 and 2008, the government is collaterally estopped from bringing a subsequent civil suit. Markus is mistaken. Collateral estoppel is a defense only when four conditions are met: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment. *Anderson v. Comm'r of Internal Revenue*, 698 F.3d 160, 164 (3d Cir. 2012). Among the many defects to Markus's proposed defense is the obvious fact that the criminal charges brought against Markus for his allegedly willful failure to file FBARs in 2007 and 2008 were dismissed. No jury ever heard Markus's case; there were no acquittals; the issue was never determined by a final and valid judgment. Collateral estoppel thus has no import here. Even acquittals in criminal cases do not preclude the Government from relitigating issues governed by

8

a different standard of proof. *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 361 (1984). Thus, as the charges here were dismissed and Markus was never found "not guilty," despite his averments to the contrary, Markus advances no argument for collateral estoppel that is relevant to his willful failure to file FBARs in 2007 and 2009.

### C. Imposition of Civil Penalties

We turn to the merits of the Government's case. As a U.S. citizen, Markus is obliged to pay taxes on his income, regardless of where it is earned. 26 U.S.C. § 61; 26 C.F.R. § 1.1-1. The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act ("BSA"), was enacted to ensure that citizens met the requirement to pay taxes on income earned abroad and "to detect and prosecute criminal activity." *See* Pub. L. 91-508, 84 Stat. 1114 (1970) (codified at 31 U.S.C. §§ 5311 *et seq.*).

The BSA instructs the Secretary of the Treasury to require any U.S. citizen "to keep records and file reports" whenever he or she "makes a transaction or maintains a relation for any person with a foreign financial agency." 31 U.S.C. § 5314(a). Treasury regulations explain further that any citizen "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country" must report certain details about the account to the Treasury Department. 31 C.F.R. § 1010.350(a). This report must be made each year by filing a Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts—a FBAR. *Id.* § 1010.306(c). And, as explained above, an FBAR must be filed with the Treasury Department no later than June 30 "with respect to foreign financial accounts exceeding $10,000 maintained during the previous . . . year." *Id. See* Report of Foreign Bank and Financial Accounts, TD F 90-22.1, *available at* https://www.sec.gov/about/offices/ocie/aml/f90221.pdf (last accessed July 6, 2018). The familiar Form 1040 includes in it Schedule B, which contains a check-the-box question that puts a taxpayer

9

on notice as to this obligation. Schedule B's instructions direct taxpayers to say "Yes" if they had authority to sign or direct the use of a foreign account. It then provides instruction for taxpayers to file an FBAR.

The Secretary of the Treasury may impose a civil penalty for the willful failure to file an FBAR if (1) the person is a U.S. citizen, *see* 31 C.F.R. § 1010.350(b); (2) the person had an interest in or authority over a foreign financial account; (3) the financial account had a balance exceeding $10,000 at some point during the reporting period; and (4) the person willfully failed to disclose the account or file an FBAR form for the account. *See* 31 U.S.C. § 5321; *Bedrosian*, 2017 WL 1361535, at *3–4 (citing cases). Furthermore, where the failure is "willful," the amount of this penalty cannot exceed the greater of either $100,000 or 50 percent of the balance of the account at the time of the violation. 31 U.S.C. § 5321(a)(5). There is no reasonable cause exception for a willful violation. 31 U.S.C. § 5321(a)(5)(C)(ii).

It is undisputed that Markus is a U.S. citizen, and he concedes that he was the owner of the Housing Bank accounts in 2007 and 2009. It is similarly undisputed that the balance of the accounts was in excess of $10,000 for each year in question.

With respect to his authority over the Banque Misr account, Markus has not refuted the factual assertions by the Government that he was able to exercise control over it. As the Treasury regulations make clear, a person has a financial interest in a financial account in a foreign country if "the owner of record or holder of legal title is a person acting as an agent, nominee, attorney or in some other capacity on behalf of the United States person with respect to the account." 31 C.F.R. § 1010.350(e)(2)(i) (emphasis added). Furthermore, the FBAR reporting requirement can be triggered under the more general standard of "signature or other authority." 31 C.F.R. § 1010.350(f). Courts have repeatedly found that "other authority" exists where a foreign account

is held by someone who acts on behalf of another, or an entity that is indirectly controlled by a U.S. person. *See, e.g.*, *United States v. Clines*, 958 F.2d 578, 583 (4th Cir. 1992) (defendant held "other authority" where defendant had "actual control of the funds," despite ownership structure); *McBride*, 908 F. Supp. 2d at 1203 (defendant had "other authority" where he could direct disbursement of funds despite "deliberately disguised ownership structure."). Under either formulation, Markus plainly exercised authority over the account through his brother and father and solicited payments to the account for his own purposes.

We next evaluate the willfulness requirement. Section 5321 authorizes a penalty for willful violations of the reporting requirement but fails to define the term "willful." 31 U.S.C. § 5321. Those cases that have taken up the issue have concluded that the term includes all conduct that is voluntary, but not conduct that is merely accidental or unconscious. *See McBride*, 908 F. Supp. 2d at 1205; *Bedrosian*, 2017 WL 4946433, at *4. This comports with the Supreme Court's instruction that the "standard civil usage . . . counsels reading the phrase 'willfully fails to comply'" as including within its scope recklessness. *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57 (2007).

Markus does not refute the allegations of willfulness and we see no other way to interpret the record. In 2007, Markus did not file an FBAR. At his plea allocution, he confessed he engaged in a criminal scheme to receive illegal bribe and kickback payments. While he did not confess to willfully failing to file an FBAR for this year, his involvement in a much larger scheme to defraud the United States puts to rest any doubt—and Markus does not refute any of this—that he willfully failed to file an FBAR for 2007. In 2008, Markus did file an FBAR. But he omitted the Banque Misr account from that filing. His tax preparer, Dennis Tomsky, has presented unrefuted evidence that Markus never disclosed the existence of the Egyptian account to him. And as Markus filed an FBAR for his Jordanian accounts, the only available inference from these facts is that he was aware

of the reporting requirement for his Banque Misr account but decided not to report it. Finally, Markus pleaded guilty to willfully failing to file an FBAR for 2009 and does not dispute it now. Thus, for each year in question, the Court finds that the willfulness requirement is satisfied.

Finally, the penalties assessed against Markus do not exceed the limitations of 31 U.S.C. § 5321(a)(5), which limits penalties to the greater of either $100,000 or 50% of the balance in the account at the time of the violation. The Banque Misr account in 2007 held within it $299,250 of unreported assets, for which the IRS assessed a penalty of $100,000. Housing Bank I held $744,854 in 2007, and the IRS assessed a 50% penalty of $372,427. Housing Bank II held $90,000 in 2007; the IRS assessed a 50% penalty of $45,000. Banque Misr, in 2008, had $364,950 in it; the IRS assessed $100,000. The next year, in 2009, Housing Bank III had $680,000 in it, and the IRS assessed a penalty of $6,362 for the account.

There is one irregularity in the penalties. The Government's briefing states that Banque Misr had $400,000 in it in 2009, but this is derived from Markus's plea allocution, in which he pleaded that between $400,000 and $1,000,000 were in his account. The IRS subsequently assessed a penalty of $218,225 for this account, which is in excess of either the $100,000 or 50% of $400,000, if indeed that was what was in the account. Markus has not refuted this, but as a matter of law, the Court cannot grant summary judgment when the Government seeks to impose a $218,225 penalty on an account it represents as having contained $400,000. The Court therefore finds that the penalty exceeds the limitations of 31 U.S.C. § 5321(a)(5), and only a $200,000 penalty may be imposed.

As such, the Court finds that the Secretary of the Treasury may impose all the civil penalties for Markus's willful failures to file FBARs in 2007, 2008, and 2009, with the exception of $18,225

assessed on Markus for the Banque Misr account in 2009. Summary judgment is granted in part and denied in part.

## IV. CONCLUSION

The Government has made its case: its motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. As for Markus's pending motions, they are **DISMISSED**, as it unclear on what legal authority they are based upon. An order follows.


Dated:  July 16, 2018                                s/ Robert B. Kugler
                                                     ROBERT B. KUGLER
                                                     United States District Judge